

(100)
2-19-0
SC

# IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

INTERNATIONAL MARKETING, INC., :
                                 :  C.A. No. 1:CV 00-0697
          Plaintiff,             :
                                 :
     v.                          : (Magistrate Judge Smyser)
                                 :
COUNTERACT BALANCING             :
     BEADS, INC.,                :
                                 :
          Defendant.             :

**FILED**
HARRISBURG, PA

FEB 1 5 2002

MARY E. D'ANDREA, CLERK
Per _____
        Deputy Clerk

RESPONSIVE BRIEF OF COUNTERACT BALANCING BEADS
IN OPPOSITION TO MOTION OF
INTERNATIONAL MARKETING FOR CONTEMPT

RATNER & PRESTIA
Costas S. Krikelis
Kevin W. Goldstein
Suite 209, Webster Bldg
3411 Silverside Road
P.O. Box 7228
Wilmington, DE  19803
(302) 479-9470

Attorneys for Defendant
Counteract Balancing Beads

Dated:  February 14, 2002

# Table of Contents

**page**

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

Relevant Background Facts . . . . . . . . . . . . . . . . . . . . . . .    6

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    12

    A.  The Legal Standard For Civil Contempt . . . . .    12

    B.  IMI Has Failed To Present Prima Facie
        Evidence To Establish That CBB Is Not
        Complying With The September Order    14

    C.  Under Federal Patent Law, CBB May
        Identify The Patent Protecting Its Product    18

    D.  CBB's Advertising Directed To Foreign
        Customers Is Not Within The Scope Of
        The September Order    19

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    26

## Introduction

Defendant Counteract Balancing Beads, Inc. ("CBB") respectfully requests that this Court dismiss outright the Motion for Contempt of plaintiff International Marketing, Inc. ("IMI" or "Plaintiff") because of the following false statements presented by IMI in support of its Motion.

Specifically, IMI's Motion and supporting memorandum contain at least two outright false statements.  These falsehoods are not simple typographical errors or minor misstatements of ancillary fact.  IMI's misrepresentations made to this Court are material and at the core of IMI's Motion as they are the focus of IMI's prima facie case. One of IMI's examples of non compliance by CBB, trumpeted to make IMI's "prima facie" case, is in fact *directly controverted* by the exact exhibit cited by and attached to IMI's brief.

Specifically addressing the false statements by IMI, on January 23, 2002, when IMI filed its Motion and supporting Memorandum, IMI represented that:

> In addition, from each of the sections of the
> website, regardless of the primary language,
> there is a drop down menu, in *English*, to assist
> with finding a distributor of the Counteract

product. <u>The United States is included in the
menu associated with each language option</u>.

(*See* IMI Memorandum, at 12)(underlining added).

This is not true. The CBB web pages addressed to
countries other than the United States *do not include*, and
have not included, reference to the United States or
locations in the United States in such drop down menus
since at least January 8, 2002, well before the January 23,
2002 filing date of IMI's motion and memorandum.

Indeed, when IMI's memorandum was first served, CBB's
undersigned attorneys immediately accessed CBB's web site
to review the noted drop down windows, because we believed
such corrections had already been implemented.  That simple
investigation by counsel for CBB confirmed that reference
to locations in the United States was not mentioned in any
of the drop down windows except for the window accessed
through the web page directed to the United States. (*See*
Affidavits of Costas S. Krikelis, Kevin W. Goldstein,
attached as Exhibit A).

Upon further investigation, CBB's counsel determined
that the CBB website was in fact revised to remove
reference to the United States in the noted menus on or

before January 8, 2002. (*See* affidavits of Roger LeBlanc, Matt Abbott, and Rick Colbourne, attached as Exhibits B and C).  Indeed the invoice from Mr. Colbourne, the CBB website creator, shows that CBB was **billed** for the work of modifying the CBB website on January 10, 2002. (*See* Exhibit D, invoice from Rick Colbourne).

How IMI could file its Motion on January 23, 2002 without reviewing or confirming its accusations is difficult to understand.  Indeed, IMI cannot claim it did not review or know of current CBB website on or about January 23, 2002 when it filed its Motion.  In that regard, IMI's Exhibits C, D, E, and F each plainly establish that IMI downloaded, reviewed and printed the CBB website pages on January 22, 2002, the day before IMI filed its Motion and at least two weeks after the CBB website was last updated. (*See* IMI Motion Exhibits C, D, E, and F, lower right hand corners each showing a date of 1/22/2002).

Second, IMI's motion also references what IMI describes as "Counteract's latest brochure." IMI points to and focuses on the "latest brochure," attached to the IMI Motion as Exhibit G (a true and correct copy of the CBB brochure is attached hereto as Exhibit E), as a further

element of its "prima facie" case and motion for contempt. In its argument, IMI states that the CBB brochure "contains the following language:"

> Old technology employed by other dry internal balancing agents allows the product to fall to the bottom of the tire every time the vehicle stops . . . _Counteract Balancing Beads' balancing method employs kinetic cling – the material stays in its balanced position even when the vehicle is stopped . . . defying gravity, with Counteract kinetic clinging micro-beads, you wont' have any of the above problems_. . . .
>
> The latest patented technology available to Counteract the out of balance condition employs kinetic clinging micro beads which stabilizes and fine tunes balancing. . . . remaining in this balanced position, defying gravity, even when the vehicle is in a stopped position. . . . _This remarkable feat of defying gravity, a kinetic clinging phenomenon is described in our patent # 6,128,952_. The result is that the glass beads do not disengage from the lining of the tire every time the tire stops motion.

(Emphasis added).

Upon even a cursory review of the above language in IMI's memorandum _and the Exhibit G attached to the IMI motion_, we see that IMI's Exhibit G _does not include_ the

language quoted by and relied upon by IMI to support its
"prima facie" case.

Instead of the misrepresentations included in IMI's
Motion and Memorandum, IMI's Exhibit G actually reads as
follows:

> Old technology employed by other dry internal
> balancing agents allows the product to fall to
> the bottom of the tire every time the vehicle
> stops . . . _Counteract Balancing Beads produced_
> _under U.S. Patent No. 6,126,952 have been found_
> _to cling to the truck tire when the vehicle is_
> _stopped.  With Counteract Balancing Beads you_
> _wont' have dust or product breakdown problems_. .
> . .
>
> The latest patented technology available to
> Counteract the out of balance condition employs
> kinetic clinging micro beads which stabilizes and
> fine tunes balancing. . . . remaining in this
> balanced position, defying gravity, _even while_
> _maneuvering curves and bends on the highway and_
> _when the vehicle is in a stopped position.  This_
> _eliminates wear and breakdown of CBB's balancing_
> _agent.  The result is that the glass beads do not_
> _disengage from the lining every time the tire_
> _stops motion._

(Emphasis added).

Contrary to IMI's representations, in the Exhibit G brochure there is simply no reference to "electrostatic cling" or to how the CBB patent describes any "kinetic cling."  Again, these are not simple typographical errors by IMI but are presented by IMI to this Court as <u>material facts to support IMI's motion for contempt against CBB</u>.

IMI's statement that CBB is playing "fast and loose" with the facts is preposterous given IMI's "fast and loose" presentation of its alleged facts.  Such conduct by IMI cannot be condoned and should not be accepted by this Court.  Appropriate sanctions should be imposed against IMI. As a minimum, CBB should be awarded its attorneys' fees incurred in investigating and responding to this meritless motion.


**<u>Relevant Background Facts</u>**

This Court is well aware of the background of the two parties, their respective products, and the fact that IMI and CBB are direct competitors in the internal tire balancing product market.  Such information need not be recounted for this motion.

1.   The Procedural History

With respect to the past history of this matter, on April 17, 2000, IMI filed a complaint in this Court alleging that certain advertising materials by CBB describing CBB's Beads truck tire balancing product contained false statements in violation of Section 43(a) of the Lanham Act.  IMI also sought an injunction to enjoin CBB from advertising that the Beads "employ electrostatic cling or otherwise stay in a balanced position even when the tire has stopped and be in a balanced position when the tire is starting, and the representations that the Beads are superior to other internal balancing beads because the Beads employ electrostatic cling or otherwise stay in a balanced position even when the tire has stopped." IMI Complaint, ¶ 17.

Following a four-day bench trial in August 2001, on September 14, 2001, the Court found that (1) CBB's Beads product are manufactured according to U.S. Patent No. 6,128,952 (the "'952 patent"), and (2) CBB's Beads "do in some instances cling to truck tire inner surfaces after normal use and in normal operating conditions." (See Memorandum and Order of September 14, 2001, at 17, 24,

attached hereto as Exhibit F). The Court further determined that CBB had not demonstrated that the clinging of the Beads was due to any electrostatic phenomenon, and that IMI had shown by a preponderance of the evidence that the Beads do not cling to the tire surface due to an electrostatic charge developed on the Beads.

   2.   <u>The September 14 Order</u>

   The Court entered a permanent injunction enjoining CBB "from making any statements to the public, its customers and potential customers in which it states or otherwise leads people to believe that Counteract Balancing Beads cling to the inside of a tire in a balancing position as a result of electrostatic cling." (*See* Exhibit F, September 14 Order).

   Thereafter, CBB timely appealed the Court's September Order to the Court of Appeals for the Third Circuit.  That appeal is pending.

   3.   <u>CBB's Actions To Comply With The September Order</u>

   Upon receipt of the September Order, CBB also immediately undertook good faith and reasonable efforts to comply with the Order.  Towards that end, immediately following the entry of Order, CBB reviewed and revised its

- page 8 -

advertising materials distributed in the United States, including its website and printed materials.  CBB immediately ceased using its prior printed brochures describing the phenomena of electrostatic cling as the basis for why the Beads cling.  CBB also changed its trademark "Electrostatic Cling Bead™" with a new name adopted for its product sold in the United States.  CBB renamed its product "Kinetic Clinging Micro-Beads™, and now uses this name and trademark throughout its advertisements to refer to its Beads product.

CBB modified its advertising materials distributed in the United States by purging all statements that the balancing beads cling to the tires *due to electrostatic cling*, and began distributing new printed advertisements such as shown in Exhibit E attached hereto.  In specific compliance with the September Order, CBB's new advertisements no longer contain references to "electrostatic cling" as being the reason the Beads cling to the inside of truck tires.  As such, contrary to IMI's representations, CBB removed all language and text describing the electrostatic theory used by CBB in CBB's prior advertisements.

Moreover, in or about October 2001, CBB re-created its internet website[1] to provide a "gate page" or "portal page" to direct users based upon their country of origin. (*See* Exhibit G). In CBB's current website, anyone accessing the site arrives at CBB's home page in which the user is invited to choose a destination through an image containing hyperlinks shaped as the flags of various countries.

Since October 2001, the home page has contained four such hyperlinks represented by the flags of Portugal, the U.S.A., Great Britain and Italy. Selecting any one of these links connects the user to pages addressed to foreign or United States customers. As such, by clicking on the Portuguese flag, the user accesses information provided in Portuguese directed to Portuguese customers. Similarly, clicking on the United States flag accesses information and advertising directed to CBB's customers in the United States.

As readily conceded by IMI, the advertising material addressed to the United States through the American Flag hyperlink is different from the advertising material addressed to foreign countries. Moreover, as shown herein,

---

1.    www.counteractbalancing.com

the advertising language addressed to the United States is fully compliant with the September Order.  Specifically, all references and explanations relating to an electrostatic cling effect of the Beads, as enjoined by the September Order, have been removed from the material appearing on the U.S. website pages.

Finally, CBB acknowledges that CBB's balancing beads are sold in packaging marked with the U.S. patent number granted to CBB for its patent which protects CBB's Beads product.  Specifically, the '952 patent noted above is listed on the Beads product packaging in accordance with 35 U.S.C. § 287.[2] CBB's advertisements similarly advise its customers and all readers that the Beads product is patented.  As noted above, the fact that the Beads are patented and manufactured according to the '952 patent were specific findings of fact of the Court in its September Memorandum Opinion. (*See* Exhibit F).

---

2.    Section 287 of the Patent Code provides in pertinent part that "[p]atentees, and persons making, offering for sale, or selling within the United States any patented article for or under them or importing any patented article into the Unites States, may give notice to the public that the same is patented, either by fixing thereon the word "patent" or the abbreviation "pat.", together with the number of the patent." 35 U.S.C. § 287.

**Argument**

    A.   The Legal Standard For Civil Contempt

    Civil contempt may be used by a court to enforce compliance with a court order or to compensate a party for damages sustained by reason of a noncompliance with the order. *A&H Sportswear Co., Inc. v. Victoria's Secret Stores, Inc.*, 134 F.Supp.2d 668, 669-70, 58 USPQ2d 1440, 1442 (E.D. Pa. 2001). In order to establish that CBB is liable for contempt, IMI must prove (1) that there is a valid order of the court; (2) that CBB had knowledge of the order; and (3) that CBB disobeyed the order. *Roe v. Operation Rescue*, 54 F.3d 133, 137 (3d. Cir. 1995); *A&H Sportswear*, 134 F.Supp.2d at 670, 58 USPQ2d at 1443.

    In order to establish the need for civil contempt, IMI must prove each of these elements by clear and convincing evidence. *Harris v. City of Philadelphia*, 47 F.3d 1311, 1321 (3d Cir. 1995); *A&H Sportswear*, 134 F.Supp.2d at 670, 58 USPQ2d at 1443. Not only is the standard to prove liability for civil contempt set high, but any question or ambiguities relating to any of the elements are to be resolved in favor of the party charged with contempt. *Harris*, 47 F.3d at 1350 (3d Cir. 1995); *A&H Sportswear*, 134

F.Supp.2d at 670, 58 USPQ2d at 1443.  Indeed, the United
States Supreme Court and the Third Circuit have held that a
party should not be held in contempt "where there is ground
to doubt the wrongfulness of the [defendant's] conduct."
*California Artificial Stone Paving Co. v. Molitor*, 113 U.S.
609, 618; *Littlejohn v. Bic Corp.*, 851 F.2d 673, 683-84 (3d
Cir. 1988).

Thus a contempt holding will fail unless the order
violated by the contemnor is 'clear and unambiguous', the
proof of non-compliance is 'clear and convincing' and the
contemnor was not reasonably diligent in attempting to
comply." *United States v. Local 1804-1, Int'l
Longshoremen's Ass'n*, 44 F.3d 1091, 1096 (2d Cir. 1995).
With respect to the latter point, courts have supported the
general proposition that a defendant should not be held in
contempt as long as the defendant took all reasonable steps
to comply with the order.  *National Labor Relations Board,
v. Local 1291, International Longshoremen's Ass'n*, 292 F.2d
182 (3d Cir. 1961).

Accordingly, where the movant cannot establish by clear
and convincing evidence its prima facie case of each of the
elements necessary for civil contempt, or where there are

reasonable grounds to doubt the assertions of the movant, the motion for contempt should be denied.

Both of these scenarios exists at bar. Not only are there clear grounds to doubt IMI's representations forming the basis of its prima facie case, but IMI has not presented clear and convincing evidence that CBB has violated the September Order.

B.  IMI Has Failed To Present Prima Facie Evidence
    To Establish That CBB Is Not Complying
    With The September Order

As shown above, IMI's prima facie evidence of CBB's non-compliance with the September Order includes IMI's misrepresentations about the current CBB fold-out brochure (*see* Exhibit E), and IMI's false statements about the CBB website. Such baseless and wrong statements of fact cannot be the basis for any prima facie case of noncompliance. Indeed, a review of CBB's brochure and the website directed to United States customers, shows that that advertising complies with the September Order.

The September Order reads in pertinent part that CBB "is hereby enjoined from making any statements to the public, its customers and potential customers in which it states or otherwise leads people to believe that Counteract

- page 14 -

Balancing Beads cling to the inside of a tire in a balancing position as a result of electrostatic cling." (*See* Exhibit F).  It is important to note that the Order does not enjoin from stating the Beads product clings, as suggested by IMI.  Indeed, the Court did find, that in certain circumstances under normal operating conditions, the Beads do cling to the inside of a tire. (*See* Exhibit F, at 24, ¶ 16).

As required by the September Order, CBB has changed its advertisements directed to the United States such that there is no longer any discussion of an electrostatic effect as being the basis for why the Beads cling. (*See* Exhibits E, G and H).  As shown above, the CBB brochure no longer references or states anything about electrostatic cling.  Moreover, the website directed to United States customers similarly does not reference or state anything about electrostatic cling. (*See* Exhibit H).

Having to concede this fact, IMI instead argues that term "kinetic," as used in CBB's current advertising, is the same as "electrostatic." IMI states that "despite the replacement in the advertisement of the word 'electrostatic' with the term 'kinetic' there is no

question that the language is still intended to lead customers and potential customers to believe that Counteract Balancing beads (1) cling to the inside of a tire in a balancing position and (2) that they do so because of 'electrostatic' forces."

IMI provides no support for such an allegation. Indeed, IMI admits that "kinetic" has a completely different definition than "electrostatic." "Kinetic" is defined as having motion, while "electrostatic" is defined as "relating to *static* electric charges." Webster's II New Riverside Dictionary, at 224 (emphasis added). One would not normally equate something having to do with "motion" with something that relates to "static" or non-moving electric charges. How IMI supports its assertion of equivalent definitions is difficult to grasp.

While IMI would like this Court to prevent CBB from making any statements suggesting that the CBB Beads cling, the September Order does not enjoin CBB from making such statements. Contrary to IMI's argument, the Third Circuit has held that obligations should not be imposed upon a party that are not unambiguously mandated by the decree itself. Consequently, "[p]rohibited conduct will not be

implied from such orders; . . . the long standing salutary rule in contempt cases is that ambiguities and omissions in orders redound to the benefit of the person charged with contempt." *Ford v. Kammerer*, 450 F.2d 279, 280 (3d Cir. 1971).

While IMI may be dissatisfied with this Court's order, a contempt proceeding does not allow a party to reopen or reconsider the legal and factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy. *United States v. Rylander* 460 U.S. 752, 756, 103 S.Ct. 1548 (1983).

The alleged contemnor must be able to ascertain from the four-corners of the order precisely what acts are forbidden.  "The Court must discern the scope of a consent judgement by review of what is within the four-corners of the consent 'not by reference to what might satisfy the purposes of one of the parties to it'." *Harley Davidson Inc. v. William Morris D/B/A Bill's Custom Cycles*, 19 F.3d 142, 148 (1994), citing *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 574 (1984) (emphasis added).

Merely because IMI has attempted to rewrite the September Order, does not establish prima facie evidence,

or clear and convincing evidence of non-compliance by CBB.
The evidence shows that CBB was reasonably diligent and
took all reasonable steps in attempting to comply with the
September Order.

     C.   Under Federal Patent Law, CBB May
          Identify The Patent Protecting Its Product

    IMI also argues that the simple mention in advertising
material that the advertised product is protected by United
States Patent No. 6,128,952 violates the September Order
because the '952 patent includes statements that the
patented beads cling due to electrostatic attraction.
However, under 35 U.S.C. 287 (*see* n. 3, *supra*), a patentee
is entitled to give notice to potential infringers that its
product is protected by an issued and valid United States
patent by identifying the patent covering the product. See
*Loral Fairchild Corp. v. Victor Company of Japan*, 906
F.Supp. 813, 816 (E.D.N.Y. 1995).  Moreover, this Court has
found that the CBB beads are indeed manufactured according
to the description and disclosure of the '952 patent. (*See*
Exhibit F, at 17, ¶ 1).

    CBB acknowledges its prior advertisements used in the
United States before the September Order stated that the
Beads performed as described in the '952 patent and quoted

certain passages from the '952 patent.  In compliance with the September Order, the new CBB advertisements distributed in the United States only give notice that the product is patented and do not quote the '952 patent.  There is no language in the current CBB advertisements provided to the United States that states or leads one to believe that the Beads cling due to an electrostatic effect.

   D.   CBB's Advertising To Foreign Customers Is Not
        Within The Scope Of The September Order

     IMI also argues that CBB, a Canadian corporation having a Canadian principle place of business, must limit the content of its worldwide advertisement according to this Court's order or else be held in contempt. IMI attempts to show that CBB violated the September Order because CBB's informational material directed to countries other than the United States via the Internet does not comply with the Order, even though the CBB advertising directed to the United States does comply with the Order.

     IMI argues that the content of CBB's web page in the world wide web is accessible from anywhere in the world through the Internet, that such access includes access from

the United States and, therefore, violates the September
Order.  The law does not support such a proposition.

In the context of the Lanham Act, Federal Courts have
held that application of the Lanham Act outside of the
territorial limits of the United States is permissible in
certain limited conditions. See, e.g., *Steele v. Bulova
Watch Co., Inc.*, 344 U.S. 280, 286-87 (1952); *Nintendo of
America Inc. v. Aeropower Co. Ltd.*, 32 USPQ2d 1199, 1201
(4th Cir. 1994); *Sterling Drug Inc. v. Bayer A.G.*, 14 F.3d
733, 745-48 (2d Cir. 1994).

More specifically, the United States Supreme Court has
held that the Lanham Act may be applied to enforce conduct
of a defendant outside of the United States where (1) the
defendant is a citizen of the United States; (2) there
exists no conflict between the defendant's rights
established under foreign law, and (3) the defendant's
conduct has a substantial effect on United States commerce.
*Steele*, 344 U.S. at 280.  Lack of any one of the above
elements is critical.  Lack of two is fatal. *Vanity Fair
Mills v. T. Eaton Co.*, 234 F.2d 633, 643 (2d Cir. 1956);
*International Café S.A.L. v. Hard Rock Café International*

*(U.S.A.), Inc.*, 252 F.3d 1274, 1276, 58 USPQ2d 1925, 1928 (11th Cir. 2001).

As applied to this matter, there is no question but that CBB is not a U.S. citizen.  Canadian Law controls CBB's activities in Canada including CBB's rights to advertise on the world wide web.  CBB is not aware of any finding under Canadian Law or by a Canadian court precluding CBB from advertising its products in Canada or in other non-United States foreign countries.  Finally, there is no showing by IMI that CBB's Portuguese, Italian and International-English web pages have any effect, let alone a substantial effect in United States commerce merely because someone in the U.S. may choose to view them.

Because at least two of the three elements provided by the United States Supreme Court, *Steele*, 344 U.S. at 286-87, have not been established, under the Lanham Act, the September Order is reasonably limited to application within the United States, and may not be used to restrict the extraterritorial activities of CBB, a foreign defendant, in foreign countries or jurisdictions.

Moreover, CBB notes that IMI provides no support for its assertion that all information placed on the world wide

web by a foreign corporation residing in a foreign country using a foreign web master may be controlled under the Lanham Act.  CBB notes that the Third circuit has addressed some of the legal issues presented by the nature of the Internet in *American Civil Liberties Union v. Reno*, 217 F.3d 162 (3d Cir. 2000).[3]

In *American Civil Liberties Union*, the Third Circuit noted that:

"The Internet is a decentralized, self-maintained networking system that links computers and computer networks around the world, and is capable of quickly transmitting communications. Even though the Internet appears to be a 'single, integrated system' from a user's perspective, in fact no single organization or entity controls the.  As a result, there is no 'centralized point from which individual Web sites or services can be blocked from the Web.' . . .

The World Wide Web is a publishing forum consisting of millions of individual 'Web sites' each containing information such as text, images, illustrations, video, animation or sounds provided by that site's creator. Some of these Web sites contain sexually explicit material. As a publishing forum, the Web is the best known method of communicating information online. Information is said to be published on the Web as soon as it is made available to

---

4.    In *American Civil Liberties Union*, the issue considered by the Court was the control of pornographic material placed on the Internet by Web Masters under certain legislation not at issue in this case. The Court struck down the legislation, as overly broad, for substantially same reasons that the United States Supreme Court had previously struck as overly broad the Communications Decency Act ("CDA").  *ACLU v. Reno*, 521 U.S. 844, 138 L.Ed. 2d 874 (1997).

others by connecting the publisher's computer to the
Internet. Each site is connected to the Internet by means
of certain protocols that permit 'the information to become
part of a single body of knowledge accessible by all Web
visitors.' As a part of this unified body of knowledge, Web
pages are all linked together so that the Internet user can
freely move from one Web page to another by 'clicking' on a
'link.' Because the Internet has an 'international,
geographically-borderless nature,' with the proper software
every Web site is accessible to all other Internet users
worldwide. Indeed, the Internet negates geometry. . . it is
fundamentally and profoundly anti-spatial. You cannot say
where it is or describe its memorable shape and proportions
or tell a stranger how to get there. But you can find
things in it without knowing where they are. The [Internet]
is ambient -- nowhere in particular and everywhere at once.

*It is essential to note that under current technology, Web
publishers cannot 'prevent [their site's] content from
entering any geographic community.' As such, Web publishers
cannot prevent Internet users in certain geographic locales
from accessing their site; and in fact the Web publisher
will not even know the geographic location of visitors to
its site. Similarly, a Web publisher cannot modify the
content of its site so as to restrict different geographic
communities to access of only certain portions of their
site.* Thus, once published on the Web, existing technology
does not permit the published material to be restricted to
particular states or jurisdictions."

*American Civil Liberties Union,* 217 F.3d at 168-70
(citations omitted) (emphasis added).

     In an implicit acknowledgement by the Third Circuit of

the territorial limitations of United States courts to

prohibit acts by foreign operators accessible through the

Internet from the United States, the Third Circuit stated

that "even if COPA were enforced, children would still be

able to access numerous <u>foreign web sites</u> containing harmful material." *American Civil Liberties Union*, 217 F.3d at 172 (emphasis added).

Internet activities and their impact in the United States have also been addressed in other districts as well. In *Playboy Enterprises Inc. v. Chuckleberry Publishing Inc.*, 939 F.Supp. 1032, 39 USPQ2d 1746 (S.D.N.Y. 1996), the defendant, Chuckleberry Enterprises, an Italian corporation, operated a web page from Italy using a trademark that had been found to infringe the Playboy's trademarks. Playboy Enterprises sought to hold Chuckleberry in contempt because Chuckleberry's home page was accessible from the United States.

Through its freely accessible home page via the Internet, Chuckleberry was actively soliciting paid subscriptions to full access of its web magazine also distributed through the Internet. *Playboy Enterprises*, 939 F.Supp. at 1034, 39 USPQ2d at 1747-48.

The *Chuckleberry* Court held that "[w]hile this Court has neither the jurisdiction nor the desire to prohibit the creation of Internet sites around the globe, it may prohibit access to those sites in *this* country. Therefore,

while Tattilo (Chuckleberry's owner) may continue to operate its Internet site, it must refrain from accepting subscriptions from customers living in the United States. In accord with this holding an Italian customer who subsequently moves to the United States may maintain his or her subscription to the Internet site." *Playboy Enterprises*, 939 F.Supp. at 1037, 39 USPQ2d at 1752 (emphasis in the original).

As such, in *Chuckleberry,* the web page was left unchanged and viewable by any one in the world including the United States. Such website access by anyone in the world was not found to be a violation of the Court's injunction.

In view of this case law, CBB modified its web page, as described above, by adopting a "portal" which separates information directed to the United States from information directed elsewhere in the world. Such separation meets the spirit, scope and requirements of the September Order, and is consistent with the limitations of the Lanham Act under federal law. CBB has clearly demonstrated its good faith in complying with this Court's order. CBB requests accordingly, that this motion for contempt be denied.

## Conclusion

For the reasons provided herein as may be supplemented by oral argument or further briefing, defendant CBB respectfully requests that this Court enter an Order denying plaintiff IMI's motion for contempt.

Moreover, the record shows that IMI has presented several false statements in its Motion as the basis for that motion. Those misrepresentations are directly material to IMI's Motion; they are at the core of IMI's "prima facie" case. Defendant CBB has been forced to defend IMI's contempt motion even though the motion is based on falsehoods. This motion should not have been brought by IMI, and as presented, is a disservice to this Court. Accordingly, CBB respectfully requests that it be awarded its reasonable attorney's fees incurred in responding to and defending IMI's Motion.

Respectfully submitted,

Costas S. Krikelis
Kevin W. Goldstein
RATNER & PRESTIA

- page 26 -

Suite 209, Webster Bldg
3411 Silverside Road
P.O. Box 7228
Wilmington, DE   19803
(302) 479-9470

Attorneys for Defendant
Counteract Balancing Beads

Dated:   February 14 , 2002

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing *Responsive Brief of Defendant Counteract Balancing Beads in Opposition To The Motion of International Marketing For Contempt* was served upon the noted counsel of record by Federal Express on February 14, 2002.

Allen C. Warshaw, Esquire
Duane Morris & Heckscher LLP
305 North Front Street, 5th Floor
Harrisburg, PA 17108

Kevin W. Goldstein