2 ₵

● **ORIGINAL** ●

(104)
3/4/02

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

INTERNATIONAL MARKETING, INC. :
Professional Arts Building           :
Suite C, P.O. Box B                     :
Chambersburg, PA 17201             :
      Plaintiff,                             :
                    :
                    :
      v.                                          :   CIVIL ACTION
                    :    No. 1:CV-00-0697
                    :
COUNTERACT BALANCING        :    (Magistrate Judge Smyser)
BEADS, INC.                                :
13029-8th Line                           :
RR # 1                                        :
Georgetown, Ontario L7G 4S4   :
      Defendant.                           :

FILED
HARRISBURG

MAR 0 1 2002

MARY E. D'ANDREA, CLERK
Per_____
DEPUTY CLERK

**REPLY BRIEF IN SUPPORT OF
MOTION FOR CONTEMPT**

## I.    Introduction

In attempting to escape the effect of this Court's Order, Counteract makes

several other arguments.  Each of them is equally without merit.  Some we will

address summarily.  One requires a longer response.

First, Counteract attempts to divert this Court's attention from its

contemptuous conduct by complaining about "falsehoods" in Plaintiff's Motion.

However, even as Counteract complains, it admits to actions that were in contempt

of this Court's Order.

The first "falsehood" that Counteract complains of resulted from the attachment of the wrong brochure as an exhibit to the Motion.  A true and correct copy of the quoted brochure is attached hereto as Exhibit "A."  As can be seen from the attached brochure, the language cited by the Plaintiff in the Motion is contained verbatim.  The quotation was not a "falsehood" but was the truth.  The real falsehood was committed by Counteract in that even as they attacked the mistaken brochure, they knew of the existence of the updated brochure having the language cited by the Plaintiff.  Counteract has attempted to deceive the Court by, in effect, denying that Counteract used the language cited in the brochure.  In fact, Counteract implicitly agrees that the language cited by the Plaintiff is in contempt of this Court's Order.

The second "falsehood" claimed by Counteract is related to drop-down menus used in the language choices of Italian, Portuguese, and English (International) which directed the user to distributors in the United States. Counteract admits that this contemptuous conduct occurred up until at least January 8, 2002, four months after the Court Order but complains that the conduct ceased prior to the filing of IMI's Motion.

Plaintiff began preparing its Motion prior to the latest change by Counteract.  Due to an oversight, the web site was not rechecked prior to filing the

Motion. However, Counteract has been a moving target ever since this Court issued its injunctive Order. It has changed different parts of its website at different times. The allegation regarding the drop down menus was not a "falsehood," but rather referred to admitted contemptuous conduct that occurred continuously up to four months after the Court Order.

Next Counteract claims that the patent laws grant the unlimited right to refer to their patent in connection with their product. This is an argument that should have been made at trial or on appeal. This Court's order clearly enjoins Counteract from making any statements "in which it states or **otherwise leads people to believe** that Counteract Balancing Beads cling to the inside of a tire in a balancing position as a result of electrostatic cling." The reference to the patent unquestionably leads people to believe that the product performs as described in the patent: that it clings to the inside of a tire in a balancing position as a result of electrostatic cling. That is barred by this Court's injunction. Counteract does not seek an amendment to that Order. Counteract cannot collaterally attack that order in a contempt proceeding. Harris v. City of Philadelphia, 47 F.3d 1333, 1337 (3d Cir. 1995); Northeast Women's Center, Inc. v. McMonagle, 939 F.2d 57, 68 (3d Cir. 1991). Thus, Counteract's continued reference to the patent constitutes contempt of this Court's Order of September 14, 2001.

3

Counteract also argues that its change of the wording "electrostatic cling" to "kinetic cling" constitutes compliance with this Court's Order. Regardless of the words used, Counteract still "**leads people to believe** that Counteract Balancing Beads cling to the inside of a tire in a balancing position as a result of electrostatic cling." Counteract's advertising materials and its patent, which are of record in this case, explained that "electrostatic" forces, which caused the beads to cling to the inside of the tire, were created by the movement of the beads within the tire. Counteract now uses the wording "kinetic cling." While Counteract defines "kinetic" as "having motion," it fails to explain how these forces can cause the beads to cling to the inside of a tire when the tire (and therefore the beads) are not moving. Counteract's clear implication is that the kinetic movement of the beads results in static electricity which caused the beads to stay in position when the tire stops rotating.

Finally, Counteract claims that this Court did not have jurisdiction to enjoin its website. That issue will be addressed below.

**II.    This Court's Order Can and Does Apply to Counteract's Entire Website**

> **A.    The Order in this Case Has No Limitation Which Would Exempt Any Part of Defendants ' Website**

By its Motion for Contempt, Plaintiff IMI merely seeks the benefit of the victory which it gained when this Court entered a judgment in its favor on September 14, 2001.  By its Order, this Court entered a simple but comprehensive injunction, enjoining Defendant Counteract from "making **any** statements to the public, its customers and potential customers in which it states or **otherwise leads people to believe** that Counteract Balancing Beads cling to the inside of a tire in a balancing position as a result of electrostatic cling."  (Emphasis added).

Nothing in that Order is ambiguous.  By its terms, it covers any and all statements, **wherever and however made**, which state or which lead people to believe that Counteract Balancing Beads cling to the inside of a tire in a balancing position as a result of electrostatic cling.  Nonetheless, now for the first time, Counteract claims that the Order cannot mean what it says: that it cannot and, therefore, does not apply to statements which Counteract makes on its website even though most of those statements are identical to those which this Court found false and misleading when it entered judgment in favor of IMI.

If defendant wishes to challenge that Order as extending to activities that are beyond the jurisdiction of the Court, it must do so by way of appeal.[1]  It may not do so by violating the Order and attacking the Order collaterally in a contempt proceeding.  Harris v. City of Philadelphia, supra; Northeast Women's Center, Inc. v. McMonagle, supra.  For this reason alone, Counteract's argument regarding this Court's jurisdiction and the scope of its Order must be rejected.[2]  In any case, as is demonstrated below, the Court had jurisdiction to issue its Order which by its terms applies to Counteract's website.

**B.     The Lanham Act Applies to False Statements Which Find Their Way Into the United States in Connection With Goods That Are Sold in the United States**

It is important to note that, for purposes of the pending Motion for Contempt, IMI does not seek to stop those misrepresentations that are made and received only outside the country by foreign customers.  There is no complaint about brochures, faxes or other statements which are distributed only to those in other countries.  IMI does object to misrepresentations which find their way into

---

[1]It was also required to raise the issue before the trial court.

[2]See Playboy Enterprises, Inc. v. Chuckleberry Publishing Inc., 939 F.Supp. 1032, 39 USPQ2d 1746 (S.D.N.Y. 1996) in which the court found that even if the internet might otherwise be entitled to special protection, "this special protection does not extend to ignoring court orders and injunctions." Id. at 1040.

the United States.  Those misrepresentations are subject to this Court's jurisdiction under the Lanham Act.

As defendant recognizes, Federal Courts have held that the Lanham Act can be applied outside of the territorial limits of the United States under certain circumstances.  See, e.g., Steele v. Bulova Watch Co., Inc., 344 U.S. 280 (1952); Sterling Drug Inc. v. Bayer A.G., 14 F.3d 733 (2nd Cir. 1994).  Defendant also correctly states the factors most often applied in determining whether the application of the Lanham Act extraterritorially is appropriate: (1) whether the defendant's conduct has a substantial effect on United States Commerce; (2) whether the defendant is a citizen of the United States; and (3) whether there exists a conflict between defendant rights established under foreign law and plaintiff's rights under foreign law.  Vanity Fair Mills, Inc. v. T. Eaton Co., 234 F.2d 633 (2d Cir.), cert. denied, 352 U.S. 871, 1 L.Ed. 2d 76, 77 S.Ct 96 (1956).  However, courts have also recognized that the mechanical application of those factors is not always appropriate especially if it might cause a court to "fail to preserve the Lanham Act's goals of protecting American consumers against

7

confusion" and protecting commercial  from unfair competition.[3]  See Sterling Drugs, Inc. v. Bayer AG, supra at 746.

In Sterling, the Second Circuit eschewed a mechanical application of its own so-called Vanity Fair test.  Instead, the Court distinguished the case before it on the ground that, in that case, unlike Vanity Fair, plaintiffs sought to enjoin those uses of the contested trademark which were likely to make their way to American consumers.  It specifically found that:

> While the Vanity Fair test is appropriate when the plaintiff seeks an absolute bar against the corporation's use of its mark outside of our borders, that test is unnecessarily demanding when the plaintiff seeks the more modest goal of limiting foreign uses that reach the United States.

Id.

Here, as in Sterling, plaintiffs seek only to stop those misrepresentations which are likely to make their way to American consumers.  That those

---

[3]Sterling was a trademark case.  Therefore, the Court identified the second purpose as "protecting holders of American trademarks against misappropriation of their marks."  Id.  However, more generally, the purpose of the Lanham Act is "to ferret out unfair competition methods and protect businesses from the unjust erosion of their good will and reputation."  P&G v. Amway Corp., 242 F.3d 539, 564 (5th Cir. 2001), citing, Conte Bros. Auto., Inc. v. Quaker State-Slick 50, Inc., 165 F.3d 221,230 (3d Cir. 1999).  See also Waits v. Frito-Lay, Inc., 978 F.2d 1093, 1108 (9th Cir. 1992).

8

misrepresentations are made on the internet does not insulate them from this

Court's jurisdiction.  If they did, the Court would have lacked jurisdiction to enter

its original Order even as to the materials which defendant admits to be directing

at American consumers.

The fact that internet users cannot prevent their sites content from entering

any geographical area does not isolate them from all regulation.[4]  Nor are they

immune because they purport to direct American consumers to one site and all

others to another.  If a site is available to (makes its way to) American consumers,

it is subject to regulation under the Lanham Act.

Certainly, the Third Circuit's decision in <u>American Civil Liberties Union v.</u>

<u>Reno</u>, 217 F.3d 162 (3d Cir. 2000) does not suggest otherwise.  The court in that

case did not hold that the internet cannot be regulated.  It merely held that the

regulation at issue in that case was much too burdensome because it would have

required the internet users to meet different standards in different geographic

areas.  In this case, there is only one standard: the truth.

_____

[4]In any case, it is simply not true that internet users cannot control access to
their websites.  They can do so by the simple method of issuing free passwords
and user IDs and refusing passwords and IDs to those in certain geographic areas.
<u>Playboy Enterprises, Inc. v. Chuckleberry Publishing Inc.</u>, 939 F.Supp. 1041,
1045, 39 USPQ2d 1846 (S.D.N.Y. 1996).

In any case, two of the three <u>Vanity Fair</u> standards are met. First, there is no apparent conflict with any foreign law. Certainly, defendant does not claim that foreign law entitles it to make false statements about its product. Second, the actions complained of have a substantial effect on United States commerce. The test here is not quantitative. Rather, the question is whether Counteract's misrepresentations are likely to make their way to American consumers and, therefore, mislead or confuse potential consumers. <u>Sterling Drugs, Inc. v. Bayer AG</u>, <u>supra</u> at 746.

Here, there is no question that Counteract's website "makes its way" into the United States. There is also no serious dispute that the statements made in the English International, Italian and Portuguese language portions of that website are essentially identical to those which this Court has already found were false and misleading.

Obviously, the English International portion is fully available to the vast majority of Americans. There is no reason to believe that labeling it an "International" site will keep American consumers from reading it

Similarly, there can be no serious dispute that the people of the United States are from various background and include many whose primary language is

Italian and Portuguese.  Certainly, those people are more likely to go to the Italian and Portuguese portions of the website than the so-called American portion.

Finally, as this Court also found, Counteract clearly sells in the United States the product to which those misrepresentations refer.  Thus, the "substantial effect" test is easily satisfied.  Id.  See also A.V. Versace, Inc. v. Gianni Versace, S.p.A., 126 F.Supp. 2d 328, 339-41 (S.D.N.Y. 2001).  Compare Atlantic Richfield v. Arco Globus Int'l Co., 150 F.3d 189, 193-94 (2d Cir. 1998).

The Sterling court also found that, in fashioning its injunction, the lower court should "'balance . . . the equities to reach an appropriate result protective of the interests of both parties.'"  Id. at 747 (citation omitted).  Here, of course, Counteract can claim no valid interest in being able to make false statements about its products.  On the other hand, IMI and American consumers have a strong interest in preventing such misrepresentations and unfair competition.  That is the interest which is intended to be protected by the domestic and extraterritorial application of the Lanham Act.  Thus, the Order in this case can and does properly apply to all of the misrepresentations on Counteract's website, whatever the title and whatever the language.

Finally, Counteract's reliance on the decision in Playboy Enterprises, Inc. v. Chuckleberry Publishing Inc., 939 F.Supp. 1032, 39 USPQ2d 1746 (S.D.N.Y.

11

1996), is puzzling.  In that case, the Court held that an order entered in 1981 applied to the content of a foreign internet site even though at the time it was entered no one could even have contemplated the development of the internet.  Id. at 1037-38.  It then found that the foreign defendant had violated that order by making certain prohibited statements on its website in connection with sales or distributions within the United States.  Id.  Based on that finding, it ordered the defendant, inter alia, to either shut down its internet site completely or adopt procedures prohibiting United States users from accessing the site.[5]  Playboy Enterprises, Inc. v. Chuckleberry Publishing Inc., 939 F.Supp. 1041, 1045, 39 USPQ2d 1746 (S.D.N.Y. 1996)(denying defendant's Motion for Reconsideration).  Thus, the decision and result in Playboy Enterprises fully support IMI's contention that Counteract's entire website must comply with this Court's Order of September 14, 2001.

---

[5]The court found that access could and, in fact, had been limited by use of passwords and user Ids.  Id.

12

## III.    CONCLUSION

For the foregoing reasons, this Court should schedule a hearing on Plaintiff's Motion and, thereafter, impose the sanctions requested by Plaintiff.

Respectfully submitted,

DUANE MORRIS LLP

Date: March 1, 2002          By: _____

ALLEN C. WARSHAW, ESQ.
Supreme Ct. I.D. Number 17145
JENNIFER L. MURPHY, ESQ.
Supreme Ct. I.D. Number 76432
305 N. Front St, 5th Floor,
P. O. Box 1003
Harrisburg, PA  17108-1003
(717) 237-5531

Attorneys for Plaintiff
International Marketing, Inc.

HBG\92721.2

13

Jan-11-02  11:06am  From-INTERNATIONAL MARKETING INC          +7172645483       T-957  P.02/05  F-072          A



# COUNTERACT

**Kinetic Clinging Micro-Beads Balancing System and how it works**



## Perfect Balance
## Perfect Wear



### KINETIC CLING

*Note:* It has been reported that some **steering** tires using CBB have recorded more than 200,000 miles.

*Distributed By*

Jan-11-02  11:07am  From-INTERNATIONAL MARKETING INC          +7172645483          T-957   P.03/05   F-072

## ADVANTAGES OF KINETIC CLINGING BEADS AND WHY THEY ARE THE BEST OVERALL!



**DYNAMIC BALANCE**
(right of centre)



**STATIC BALANCE**



**DYNAMIC BALANCE**
(left of centre)

### ADVANTAGES OVER LEAD WEIGHT MACHINE BALANCING

Counteract Balancing Beads balance for the complete life of the tire because they can readjust the balanced position as required... something lead weights are unable to do. Counteract Balancing Beads balance the complete wheel assembly in all wheel positions on both truck and trailer and do so economically. Counteract is protected from road hazards and obstructions inside the tire and will not fall off as lead weights can do... saving the environment from the problems caused by lead weights.

### ADVANTAGES OVER OTHER INTERNAL BALANCING AGENTS

Old technology employed by other dry internal balancing agents allows the product to fall to the bottom of the tire every time the vehicle stops. As a result of this, the vehicle and its wheel assembly experience vibration until eventually balancing again at highway speeds. This occurs after every stop. The result of this repeated action can break the product down, creating dust related problems such as clumping (if moisture is present), and numerous other difficulties... all resulting in extra labor for the tire installer. Counteract Balancing Beads' balancing method employs kinetic cling — the material stays in its balanced position even when the vehicle is stopped...defying gravity, with Counteract kinetic clinging micro-beads, you won't have any of the above problems.

### ADVANTAGES OVER BALANCING RINGS

Unlike balancing rings, Counteract does not have to go through a vibration and eventual balancing after every stop. Counteract is protected, inside the tire, from road hazard damages. Counteract is a lot less expensive than a balancing ring and is also reusable.

# Just throw it in!





All that you have to do is open the outside package and throw the inside bag into the tire

➤ This method allows the use of an air blaster to seat the tire on the rim, without contaminating the seating area

➤ The air blaster pressure inside the tire will collapse the bag containing **Counteract**'s Kinetic Clinging Balancing Beads or it will break soon after use.

➤ The kinetic clinging **Counteract** Balancing Beads will automatically balance the complete wheel assembly and will stabilize in the balanced position even when the vehicle is stopping and starting — effectively eliminating wear and tear and preventing all dust related problems.

**Call 1-800-572-8952
for information on distributors in your area.**
MSDS information available upon request.

Jan-11-02  11:08am  From-INTERNATIONAL MARKETING INC         +7172645483         T-957  P.04/05  F-072



## OUT OF BALANCE WHEEL ILLUSTRATION AT HALF REVOLUTION



The latest patented technology available to Counteract, the out of balance condition employs kinetic clinging micro beads which stabilizes and fine tunes balancing. When Counteract Balancing Beads (CBB) are injected inside the tire they gradually move through inertia in the opposite direction of the up and down motion and automatically counteract the imbalance, remaining in this balanced position, defying gravity, even while maneuvering curves and bends on the highway and when the vehicle is in a stopped position. This eliminates wear and breakdown of CBB's balancing agent. This remarkable feat of defying gravity, a kinetic clinging phenom-

enon is described in our patent #6,128,952. The result is that the glass beads do not disengage from the lining every time the tire stops motion. CBB will readjust if necessary to keep the tire and wheel assembly balanced throughout the entire life of the tire. This prevents clumping due to moisture and eliminates dust problems. This product is environmentally friendly and will not react to any known chemicals. These unique characteristics result in providing the best of both worlds; the mechanical fixed weight balancing of tires and the automatic adjustment of internal balancing agents.

## HOW IT WORKS



The CBB will be evenly distributed around the tire as it begins to roll through centrifugal force.

As the centrifugal force of the out of balance (heavy spot) increases and pulls up and down on the suspension, the CBB start to move in the opposite direction of the downward and upward travel through inertia.

The CBB continue to travel until the complete wheel assembly is balanced.

As explained in the patent, the beads "do not disengage from the lining whenever the tire stops motion" and thus the kinetic clinging beads maintain the wheel assembly in a balanced state.

This process combines the advantages of both types of balancing; the mechanical fixed weight balancing of the tires, and the automatic adjustment of internal balancing agents.



www.counteractbalancing.com

## IN TODAY'S WORLD IT JUST MAKES SENSE TO BALANCE ALL YOUR TIRES. AND, IT'S RELATIVELY INEXPENSIVE ESPECIALLY CONSIDERING THE BENEFITS:

➢ **Substantial savings** on wear and tear of the vehicle

➢ An average of 30% improvement on **tire life**

➢ Decreased rolling resistance of the tires and **improved fuel economy**



### RUSSIAN ROULETTE

All parts of a wheel assembly are manufactured with tolerances for imperfections. By assembling together all these parts and their imperfections without balancing the complete wheel assembly, you are playing Russian Roulette with your mechanical repairs, tire expenses and fuel economy. The vibration that the driver feels from the steering tires also applies to all of the remaining wheels of the vehicle. In this example, the same forces are there, only they are multiplied by the dual wheel assembly to 120 pounds of up and down force. Heavy loads only shorten the wave length of the vibration. This up and down force (vibration), of 1100 times per minute, damages not only the tires, but over a period of time, many of the vehicle components, and is one of the main reasons that wheel fasteners, maxi booster clamps, U-bolts and torque rod bolts work themselves loose, not to mention cracking in frame rails and cross members, breaking of air brackets, door hinges, lights, etc. As this 120 pound centrifugal force and its rebounding multiplying factor hit the road, it has the same effect as slightly applying the brake or hitting a pot hole 550 times per minute, increasing the rolling resistance of the entire vehicle. This is because the only contact it has with the ground are its tires.

**FOR INFORMATION CONTACT COUNTERACT BALANCING BEADS** TOLL FREE AT 1-800-572-8952, FAX 905-873-3088 LOCAL CALLS 905-873-3339



## THE LATEST TECHNOLOGY IN TRUCK TIRE BALANCING



### KINETIC CLINGING BALANCING MICRO-BEADS — HERE'S HOW THEY WORK!

A recent survey with respect to truck tire balancing reflected that the average wheel assembly imbalance for a tire size of 11R22.5 and 11R24.5 and low profile was 6 oz. balance off the vehicle and 8 oz. balance on the vehicle. For purposes of explaining the concept of tire balancing we will use the conservative average of 6 oz.

At a speed of 60 miles per hour the above sized tire revolutions per mile would be an average of 550 revolutions per minute. As a result of centrifugal force, the 6 oz. out of balance, or what is commonly referred to as the "heavy spot," will multiply itself to 60 pounds (160 g's). As the suspension of the vehicle only allows for vertical motion, the 60 pounds of centrifugal force will compress upwards and downwards on the suspension 550 times per minute, which can be reinterpreted as 1100 shock waves.

Vibration is maximized when the combined force of the rebound and the out of balance centrifugal force are aligned and resonating with reflex frequency of the suspension in unison at highway speeds; this dribbling effect sufficiently multiplies the up and down forces so as to result in the tire bouncing off the road surface. This also explains why vibration is felt only at certain speeds, and why it can be exaggerated or reduced after hitting a bump. This effect can only be eliminated by altering speed (i.e. separating the out of balance and rebound force frequencies), or by balancing the tires and wheel assembly.

## CERTIFICATE OF SERVICE

On this 1st day of March, 2002, I, Patricia Z. Glusko, a secretary in the law offices of Duane, Morris LLP, hereby certify that I have served this day true and correct copies of the foregoing document in the above-captioned matter, by depositing same in the United States First Class Mail, postage prepaid, in Harrisburg, Pennsylvania, to those persons and addresses indicated below:

Counteract Balancing Beads, Inc.
c/o Kevin W. Goldstein, Esquire
Ratner & Prestia
Suite 209, Webster
3411 Silverside Road
P.O. Box 7228
Wilmington, DE  19803

Patricia Z. Glusko